UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

United States of America,

                                              CR-04-410 (CPS)

        - against -                           SENTENCING
                                              MEMORANDUM & OPINION

Anthony Lucania & Gerard Cavera,

                Defendants.

----------------------------------------X

SIFTON, Senior Judge.

        Anthony Lucania and Gerard Cavera were named in an
indictment on June 29, 2004.  Lucania pled guilty to a single
count of illegally dealing in firearms in violation of 18 U.S.C.
§ 922(a)(5).  Cavera pled guilty to conspiring to deal in and
transport firearms in violation of 18 U.S.C. § 922(a)(1)(A)&(5).
These defendants are presently before the Court for sentencing.
For the reasons that follow, the Court will consider a non-
Guidelines sentence for each defendant.

<u>Discussion</u>

        The Supreme Court held in *United States v. Booker*, 125 S.Ct.
738 (2005), that the mandatory nature of the United States
Sentencing Guidelines violated the Sixth Amendment.  In its
remedy opinion, the Court severed 18 U.S.C. § 3553(b)(1), which
had rendered the Guidelines binding on federal sentences.  *Id.* at
764.  This left 18 U.S.C. § 3553(a) in effect, which states:

The court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed--

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established for--

        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

    (5) any pertinent policy statement--

        (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statements by act of Congress . . . .

    (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

In sentencing these defendants, the Court must determine the applicable Sentencing Guidelines range after making such factual findings as are necessary. *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). Then the Court must consider policy statements issued by the Sentencing Commission, as required § 3553(a)(5). *Id.* This applicable Guideline range is determined in the same manner as before *Booker*. *Id.* The Court has the duty

to "consider" this Guidelines calculation along with the other
relevant factors listed in § 3553(a). *Id.* at 112-13. The
applicable factors are discussed below.

Characteristics of the Defendants and the Offense

These facts are drawn from the Presentencing Investigation
Report. They are undisputed except where noted.

Anthony Lucania was born in 1922. He dropped out of high
school in 1936 to find work. From 1942 to 1946, he served in the
Air Force, and remained a reservist until 1949. He is trained as
a welder, has worked as a restaurant manager, foreman, automobile
salesman, mechanic, and welder. He has been retired since 1977,
and is supported by Social Security and pension benefits and the
assistance of his children. He filed for Chapter 7 bankruptcy in
2001. Lucania has three adult children, and is presently married
but separated from his wife. He suffers from diabetes,
arthritis, high blood pressure, coronary artery disease, and
other age-related maladies.

Cavera is a 70 years of age. He served in the Army from
1957 to 1959, during which time he received a good conduct medal.
Formerly, he operated an auto garage for a number of years during
the 1970s and 1980s. He retired from car repair in 1986, but
began a contracting business in 2004. He is married and has five
adult children. He and his wife have accumulated substantial
unexplained wealth. They own three homes in New York and one in
Florida. The two homes are jointly valued at over a million

dollars, and Cavera has approximately $350,000 in his bank accounts.

Neither Cavera nor his 70 year old wife are in good health. Cavera has high blood pressure, was diagnosed with gout in the mid 1990s, and has a biannual colonoscopy to remove polyps. Both he and his wife have Type II diabetes. His wife's ailments are more substantial than his. In 1994, she was diagnosed with breast cancer. In 1995 and 1999 she suffered heart attacks. She currently suffers from severe heart problems. In 2003, her breast cancer returned, and a mastectomy was performed. An implant was inserted, but complications later necessitated its removal.

### The Offense

The convictions in this case arose out of an F.B.I. investigation into firearms transactions by Lucania, Cavera, and a co-conspirator Peter Abbadessa. Over the course of several months, Abbadessa, with the aid of Cavera and Lucania, made several illegal firearms sales to an informant.

The transactions began on July 29, 2003, when Peter Abbadessa offered to sell firearms to the informant. On August 9, 2003, at the direction of the F.B.I., the informant purchased two guns for $1,500. Abbadessa told the informant that his uncle's friend, the defendant Cavera, brought guns to New York from Florida. On September 3, 2003, the cooperating witness paid Abbadessa $5,100 in anticipation of receipt of six additional handguns. Abbadessa eventually delivered five handguns and,

according to the PSR, stated that he would have to check with his
uncle, the defendant Lucania, about the discrepancy.[1]  On
December 27, 2003, Abbadessa and the informant discussed the
possibility of obtaining more guns from Florida, and Abbadessa
stated that his Florida gun supplier was "loading up."

Lucania met with the informant on January 3, 2004.  At this
meeting, Lucania stated that he would sent word to Cavera in
Florida, and that Cavera was a former gun dealer who could obtain
guns without any paperwork.  On January 17, 2004, Lucania told
the cooperating witness that he had met with Cavera and that
Cavera had 17 firearms.  Four days later, Abbadessa told the
informant that Cavera had 20 firearms.  On March 18, 2004,
Lucania provided the cooperating witness with a list of 16
firearms for sale, at a total price of $11,500.

Abbadessa, Lucania, and the cooperating witness traveled
together to Florida on April 8, 2004, to pick up the guns.  At
the direction of the F.B.I., the cooperating witness gave $11,500
to Lucania for the firearms.  Abbadessa and Lucania then traveled
to Cavera's residence where they gave him money in exchange for
the firearms.  Abbadessa and Lucania placed the guns in a box in
a trunk of their car.  The F.B.I. later recovered 16 firearms
from this vehicle.  Abbadessa, Lucania, and the cooperating

---

[1] Lucania objects to the portion of the PSR concerning
Abbadessa's statement that he had to check with Lucania about the
missing gun.  Since the Government has withdrawn allegations that he
defendants were in organized crime, I disregard it for sentencing
purposes.

witness returned to New York on separate flights.  Two weeks
later, on April 20, 2004, Abbadessa sold the cooperating witness
another handgun for $1,500.[2]

On May 11, 2004, the cooperating witness provided Lucania
with $2,000 to ensure the continuation of their dealings.  At
this time, the cooperating witness told the defendants that he
intended to sell the firearms he had purchased on the street.
Lucania later told the cooperating witness that Cavera had
another twelve guns in Florida.  Lucania suggested that he and
the cooperating witness should return to Florida to retrieve the
guns.  Lucania also stated that previously Cavera had brought
carloads of guns to New York.

Guidelines CalculationS

Cavera

Pursuant to § 2K2.1(a)(7), Cavera's base offense level for
firearm trafficking is twelve.  After adding four levels pursuant
to § 2K2.1(b)(1)(B) to reflect the quantity of guns involved and
a three level reduction for acceptance of responsibility pursuant
to § 3E1.1, Cavera's total offense level is thirteen.  His
criminal history category is I.  The Sentencing Commission's
recommended sentence is twelve to eighteen months.  Cavera does
not object to these calculations.

Cavera moves for downward departures pursuant to § 5H1.4 due
to his own illness and pursuant to § 5H1.6 based on the

---

[2] This transaction does not appear to be linked to Cavera.

consequences of a Guidelines sentence on his family due to his
wife's health.  Cavera contends that his wife's condition
requires his presence.  Downward departures are only permissible
in "especially compelling circumstances." *United States v.
Selioutsky*, 409 F.3d 114, 119 (2d Cir. 2005).  The factor in
question must be "present to a degree substantially in excess of
that which ordinarily is involved in the offense." *Koon v.
United States*, 518 U.S. 81, 95 (1996).  Yet, a "family
circumstances" departure is generally inappropriate where other
relatives can meet the family's needs. *Selioutsky*, 409 F.3d at
119.  In this case, the Caveras have five adult children living
in the State of New York, each of whom are college graduates.  In
addition, Cavera and his wife have a net worth in excess of $1
million, and can afford adequate care for his wife in his
absence.  Although his wife will no doubt suffer the emotional
hardship of her husband's absence, that situation is not
uncommon.

Nor is Cavera's own health especially poor.  His ailments
are not extreme or unusual, and there is no evidence that the
bureau of prisons is not equipped to deal with them.  *See United
States v. Martinez*, 207 F.3d 133, 139 (2d Cir. 2000).
Accordingly, no departure is warranted.

<u>Lucania</u>

Lucania's base offense level is twelve pursuant to §
2K2.1(a)(7).  A three-level reduction for acceptance of
responsibility is appropriate.  In addition, the PSR recommends a

four-level increase pursuant to § 2K2.1(b)(1)(B) because more
than eight firearms were involved.  Lucania objects that he
should only be held responsible for sixteen firearms sold to the
cooperating witness during the Florida trip, and not the other
firearms Abbadessa sold.  He concedes, however, that because the
Guidelines apply the same four-level enhancement for trafficking
of sixteen to twenty-four firearms.  And since I do not propose
to take this difference in quantity into account for purpsoes of
sentencing, this factual dispute need not be resolved.  *See* FED.
R. CRIM PRO. 32(i)(3)(B) (factual disputes that do not affect
sentencing need not be resolved).  These factors produce a Total
Offense Level of 13.

Lucania's Criminal History Category is I.  He has prior
convictions for robbery in 1939 and possession of gambling
receipts in 1973, but sentences for those offenses were imposed
too long ago to result in Guidelines points.  The Guidelines
accordingly call for a sentence between twelve and eighteen
months.

Like Cavera, Lucania moves pursuant to § 5H1.4 for a
downward departure due to his health.  But also like Cavera,
Lucania's illnesses are neither extreme or unusual, and there has
been no showing that the Bureau of Prisons cannot adequately
provide suitable medical care.

The Seriousness of the Offense and General Deterrence

Section 3553(a)(2) instructs the Court in sentencing the
defendants to consider the seriousness of their conduct and the

need to deter the public at large from following in their footsteps. One factor that bears on the seriousness of the offense and the need for deterrence is the likely harm that would result from the commission of the crime in question. The likely harm from an offense or class of offenses is in part a product of factors external to the criminal activity itself –– in other words, factors determined by the environment in which the crime is committed. In the pursuit of national uniformity in sentencing practices, however, the Guidelines do not take into account how local circumstances regarding the seriousness of various offenses and how the need for deterrence may vary across districts.

The Sentencing Reform Act directed the Sentencing Commission to "consider" the "community view of the gravity of the offense." 28 U.S.C. § 994(c)(4). The Senate Report further instructed that the relevant community could be either national or regional, and that in some cases, the Commission might find it appropriate to draft the Guidelines "to take account of considerations based on pertinent regional differences." S. Rep. 98-225 at 170. The Commission has, so far, never accepted the invitation to craft regional Guidelines. The Guidelines recommendations accordingly reflect a national "average" that does not take into account the particular effect of certain crimes in certain communities. Reena Raggi, *Local Concerns Local, Insights,* 5 FED. SENT. R. 306 (1993).

Prior to *Booker*, when she was a member of this Court, Judge

Raggi argued on this ground for recognition by the Commission of the authority of judges to depart from the Guidelines when they could "point with specificity to local concerns." *Id.* Others have agreed. *See* Michael M. O'Hear, *Localization and Transparency in Sentencing*, 27 HAMLINE L. REV. 357 (2004); *Vincent L. Broderick, Local Factors in Sentencing*, 5 FED. SENT. REP. 314 (1993) (arguing that the Sentencing Commission's silence on local conditions renders them a permissible grounds for departure because not "adequately taken into consideration" by the Commission under 18 U.S.C. § 3553(b)). As I have previously noted in interpreting the Sentencing Reform Act, one should be able to account for local concerns in sentencing by identifying "pertinent" regional differences that "warrant" sentencing disparity. Charles P. Sifton, *Theme and Variations: The Relationship Between National Sentencing Standards and Local Conditions*, 5 FED. SENT. REP. 303, 310 (1993). Pertinent differences must be: a) founded in fact; and b) justified by reasons of general applicability. *Id.*

The Courts of Appeals interpreting the Guidelines have declined to permit departures from the Guidelines based on "community standards" or "local public opinion." For example, the First, Fifth, and Eleventh Circuits have reversed upward departures based on particular local hostility to a particular offense. *See United States v. Barbontin*, 907 F.2d 1494, 1498 (5th Cir. 1990) (reversing upward departure because the crime was serious "by San Antonio standards"); *United States v. Aguilar-*

*Pena,* 887 F.2d 347, 351-53 (1st Cir. 1989) (reversing upward departure based on Puerto Rico's "sentiment, feelings, and mores" involving cocaine trafficking); *United States v. Hadaway*, 998 F.2d 917 (11th Cir. 1993) (rejecting defendant's argument that "rural Georgians routinely violate federal firearms statutes"). Departures based on local feelings like these are inappropriate because the judge in such a case:

> is not making a factual determination about the impact of
> guns locally, much less in parts of the country with which
> the judge is less familiar.  Nor is the judge expressing
> valid reasons of general application.  Basing a sentence on
> such parochial reasoning is engaging in an effort to set
> aside national norms on the basis of local concerns without
> examining the factual or legal significance of those
> concerns.

Sifton, 5 FED. SENT. REP. 303.

Consistent with this analysis, Judge Raggi has argued that the Sentencing Guidelines -- or at least the version applicable to crimes committed prior to 1990 -- did not adequately reflect the seriousness of the impact that illegal firearm trafficking has on large metropolitan areas such as exist within the Eastern District of New York.  5 FED. R. SENT. REP. 306.  Firearms smuggled into New York City commonly end up in the hands of those who could not otherwise legally acquire them, are frequently used for illegitimate purposes, and have the potential to create a substantially greater degree of harm when in an urban environment such as New York City than in the United States generally.[3]

---

[3] The Census Bureau estimates the population of the state of New York at 19,258,082 and the nation as a whole at 295,507,134 in 2005.

(continued...)

Statistics support these conclusions.  Despite the dramatic reduction in crime during the 1990's, homicide rates in large urban areas remain substantially higher than in suburban and rural areas.  *See* Homicide Trends in the U.S., Trends by City Size, *available at* http://www.ojp.usdoj.gov/bjs/homicide/ city.htm (last visited July 26, 2005).

Stiffer sentences for gun traffickers who move their wares into large metropolitan areas such as New York City are also supported by the purpose of gun trafficking laws, which is to prevent lax firearm laws in one state from undermining the more restrictive laws of other states.  That purpose is not served by imposing sentences without regard for objective circumstances existing in the destination city.  In states with strict gun control laws, such as New York, a higher percentage of guns used in crimes arrived from out of state.  Bureau of Alcohol Tobacco and Firearms "trace data" reveal, for example, that "many

---

[3](...continued)
http://www.census.gov/population/projections/SummaryTabA1.pdf (last visited July 26, 2005).  New York is currently the third most populous state in the nation.  *Id.*  New York covers 54,556 square miles of land, Land and Water Area of States, *available at http://www. infoplease.com/ipa/A0108355.html* (last visited July 26, 2005), while the United States as a whole is 3,794,083 square miles.  Basic U.S. Geography, *available at* http://www.infoplease.com/ipa/A0004924.html (last visited July 26, 2005).  The population density of New York is therefore about 353 people per square mile, while the population density of the United States on average is therefore only about 78 people per square mile.  The population density of parts of the Eastern District of New York exceeds 35,000 per square mile.  *See* City of New York& Boroughs: Population and Population Density from 1790, *available at* http://www.demographia.com/dm-nyc.htm (last visited July 26, 2005).  New York City as a whole is the most densely populated urban area of the country.  *See* 30 Most Densely Populated Cities, *available at* http://www.nlc.org/about_cities/cities_101/ 187.cfm (last visited July 26, 2005).

handguns recovered in cities with restrictive state and local firearms laws (e.g., Boston and New York) were first purchased in states with less restrictive firearms laws. Conversely, in those jurisdictions with lenient gun laws (e.g., Atlanta and Dallas), most recovered firearms were first purchased in-state." Anthony A. Braga et al., *The Illegal Supply of Firearms*, 29 CRIME & JUSTICE, 319, 331 (2002); *see also id.* at 333 ("The percentage of crime guns imported from out-of-state is closely linked to the stringency of local firearm controls."). Local regulation renders gun running a more serious problem and creates a larger black market in large metropolitan areas such as New York City than in other places. *See* Gary Kleck, *BATF Gun Trace Data and the Role of Organized Gun Trafficking in Supplying Guns to Criminals*, 18 ST. LOUIS UNIV. PUB. L. REV. 23, 41 (1999) (describing New York City as one of the "unusual areas" to which running guns is a profitable enterprise). Accordingly, a more severe penalty is necessary to produce adequate deterrence.

The Sentencing Guidelines for illegally transporting firearms have to some extent increased in severity since their inception.[4] Nevertheless, it remains the case that they represent a national "average" that does not reflect objective variations in the increased risk of death or injury that the offense creates in different parts of the country. Because the

---

[4] The 1987 version of the Guidelines provided for a base offense level of nine. The 1989 Guidelines provided a base level of six, but include upward adjustments tied to the number of firearms involved. The 1991 Guidelines provided for a base offense level of 12.

Sentencing Guidelines for firearms offenses neglect this critical factor bearing directly on the greater need to deter this sort of offense in this district, they are less persuasive than they would otherwise be in determining an appropriate sentence.

Accordingly, although subjective considerations such as "local mores" or feelings about a particular type of crime may not be an appropriate basis for granting a Guidelines departure or a non-Guidelines sentence, that the crime will have a greater or lesser impact given the locality of its commission is appropriately considered in crafting a reasonable sentence post-*Booker*.

Unwarranted Sentencing Disparity

Section 3553(a) instructs the Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Although it may be argued that granting a non-Guidelines sentence based on the varying impact a crime has in different locations may increase disparity between districts, disparity which is the result of differences between the seriousness of the two offenses is not "unwarranted." Where two similarly situated defendants are sentenced differently in two different districts based on objectively demonstrated, material differences between the impact of the offenses in those districts, such disparity is not "unwarranted." Indeed, such differences may reduce the disparity between sentences imposed in state as opposed to federal court. After *Booker*, federal courts have considered the disparity

between defendants convicted in state court and federal court as one factor to be considered in crafting a reasonable sentence. *See, e.g., United States v. Moreland*, 366 F. Supp. 2d 416, 423 n.2 (S.D.W.Va. 2005); *United States v. Biheiri*, 356 F. Supp. 2d 589 (E.D.Va. 2005) (noting "the obvious and well-publicized disparities in sentences imposed in the federal and state systems").

A conviction for similar conduct in a New York state court would likely earn the defendants a substantially more severe sentence than that called for by the Guidelines. A conviction for transporting or shipping firearms in violation of New York Penal Law § 265.10 is a class D felony, subjecting a defendant to a sentence of two to seven years imprisonment. *See* N.Y. PENAL LAW § 70.02(3)(c). Or, more likely, the defendants would have been charged with criminal sale of a firearm in the second degree in violation of New York Penal Law § 265.12, which prohibits the unlawful sale of ten or more firearms. That offense is a Class C felony, N.Y. PENAL LAW § 70.02(1)(b), carrying a sentence of three and one half to fifteen years imprisonment. *See* N.Y. PENAL LAW § 70.02(3)(b).

That New York, a state containing the largest urban community in the country, treats this sort of offense more seriously than the United States Sentencing Guidelines, which were designed to produce uniform sentences without respect to geography or local community concerns, is not surprising. The United States at large is substantially more rural than New York.

Firearms are less likely to cause harm in more rural areas, if only because they are less likely to cause harm to innocent bystanders.  They also have more legitimate recreational uses in rural states than in New York.  New York courts accordingly consider stemming the flow of weapons into New York a "critical law-enforcement goal."  *People v. Brown*, 99 N.Y.2d 488, 493 (N.Y. 2003).

It is also worthy of note that Congress authorized the creation of some sentencing disparity between districts in the PROTECT Act of 2003, Pub. L. No. 108-21 § 401(g)(1), 117 Stat. 650, 671, when it authorized the Justice Department to create "fast-track" programs in districts with enormous case loads concerning a specific class of offenses, such as immigration violations.  Such programs are only available in districts that adopt early disposition programs, approved by the Attorney General.  Fast-track programs speed case processing in these high-volume districts by "offering extraordinary sentencing discounts in return for early pleas."  Frank O. Bowman III, *The Failure of the Federal Sentencing Guidelines*, 105 COLUM. L. REV. 1315, 1339 n.113 (2005); *see generally* Erin T. Middleton, Note, *Fast-Track to Disparity*, 2004 UTAH L. REV. 827 (2004).  The Sentencing Commission then created an "early disposition departure" of four levels in districts that had created such programs.  *See* U.S.S.G. § 5K3.1.  The result is substantial congressionally authorized sentencing disparity between districts based on the geographic distribution of certain types of crimes

and the need to dispose of those cases quickly and efficiently.
*See United States v. Ramirez-Ramirez*, 365 F. Supp. 2d 728
(E.D.Va. 2005) (providing statistics concerning degree of
sentencing disparity created by fast-track programs). Such fast-
track programs are "perhaps the quintessential form of . . .
localization in federal sentencing." O'Hear, 27 HAMLINE L. REV. at
373.

The disparity created by imposing a longer sentence for
firearms trafficking into large metropolitan areas such as New
York City is at least as well justified as the disparity created
by these fast-track programs. Fast-track programs have been
criticized as creating disparity because of the limited resources
that certain judicial districts have in relation to their
overwhelming caseloads. But a district's resource shortage is an
"extra legal" consideration only arguably related to the purposes
of criminal sentencing.[5] Lengthier sentences based on an
increased likelihood of harm in a given locality, on the other
hand, is tied to the congressionally authorized purposes of
sentencing contained in § 3553(a) such as providing adequate
deterrence and reflecting the seriousness of the offense.

Specific Deterrence

Section 3553(a)(2)(C) also requires the Court to
specifically consider the need for specific deterrence, that is

---

[5] *See* Middleton, 2004 UTAH L. REV. at 844. Some Post-*Booker*
courts have used non-Guidelines sentencing to reduce the "extra-legal"
disparity produced by fast-track programs. *E.g., United States v.
Galvez-Barrios*, 355 F. Supp. 2d 958 (E.D. Wis. 2005).

to deter these particular defendants from committing similar
offenses in the future. Post-*Booker* courts have noted that
recidivism is markedly lower for older defendants. *E.g., United
States v. Eberhard*, 03 CR. 562, 2005 WL 1384038 (S.D.N.Y. June 9,
2005); *United States v. Coleman*, 370 F. Supp. 2d 661, 681 (S.D.
Ohio 2005); *Simon v. United States*, 361 F. Supp. 2d 35, 48
(E.D.N.Y. 2005); *United States v. Hernandez*, 03 CR. 1257, 2005 WL
1242344, at *5 (S.D.N.Y. May 24, 2005); *United States v. Carmona-
Rodriguez,* 04 CR 667, 2005 WL 840464, at *5 (S.D.N.Y. Apr. 11,
2005); *United States v. Nellum*, 2:04-CR-30, 2005 WL 300073, at *3
(N.D.Ind. Feb. 3, 2005).

Cavera is over seventy and Lucania is over eighty. They are
substantially older than the average defendant charged with
firearms trafficking. Although I conclude that the Guidelines do
not recommend a sufficiently lengthy sentence for defendants
convicted of trafficking guns into large metropolitan areas such
as New York City, the Guidelines also do not take into account
the inverse relationship between age and recidivism.
Accordingly, I will also take into account the defendants' ages
in fashioning a non-Guidelines sentence

*Ex Post Facto* Issues

The defendants argue that imposition of a non-Guidelines
sentence implicates the *ex post facto* and due process clauses of
the Constitution because at the time they committed the offense,
the Guidelines were mandatory. Post-*Booker* courts have uniformly
rejected this argument. *See, e.g., United States v. Jamison*,

2005 WL 1683961, – F.3d – (7th Cir. 2005); *United States v. Lata*,
2005 WL 1491483, – F.3d – (1st Cir. 2005); *United States v.
Scroggins*, 411 F.3d 572 (5th Cir. 2005); *United States v. Duncan*,
400 F.3d 1297, 1306-07 (11th Cir. 2005); *United States v. Gray*,
362 F. Supp. 2d 714, 728 (S.D.W.Va. 2005); *United States v.
Correa,* 02-CR-92, 2005 WL 1113817, at *1 (W.D. Wis. May 10,
2005); *see United States v. Goldberg*, 406 F.3d 891, 894 (7th Cir.
2005) (expressing surprise that defendant's attorney believed
that defendant could not receive an above-Guidelines sentence
after *Crosby/Paladino* remand without explicitly addressing *ex
post facto* concerns).

The *ex post facto* clause prevents the creation of new
criminal liability after the event.  It does not, however, apply
to changes wrought by judicial decision.  *Rogers v. Tennessee*,
532 U.S. 451, 460 (2001).  The change from a mandatory to an
advisory Guidelines regime was purely the result of judicial
interpretation in *Booker*.  This case therefore differs from a
formal Guidelines amendment.  *Lata*, 2005 WL 1491483.

An after-commission judicial enlargement of the maximum
sentence may, however, violate due process based on lack of fair
warning, but only where it is "unexpected and indefensible" by
reference to the case law that existed at the time of the
offense.  *Lata*, 2005 WL 1491483 (quoting *Rogers*, 532 U.S. at 461,
and citing *Bouie v. City of Columbia*, 378 U.S. 347 (1964)).  The
transition from a mandatory to an advisory Guidelines system was
the product of a series of cases spanning five years, starting

with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), then *Ring v. Arizona*, 536 U.S. 584 (2002), and *Blakely v. Washington*, 542 U.S. 296 (2004) and culminating with *Booker*.  It was therefore neither "unexpected," nor an "indefensible" departure from the law applicable at the time of the defendants' criminal activity.

        Nor could it be said that the defendants lacked fair warning of the range of sentences to which his crime would expose them. *Cf. Duncan*, 400 F.3d at 1308.  The statutory maximum for their offenses have not changed, and even prior to *Booker*, an upward departure was always possible.  *See* § 4A1.3 (providing for upward departures based on inadequacy of criminal history category). Under similar circumstances, the First Circuit has held that a defendant had sufficient notice of the post-*Booker* sentence he could receive where it was not "wildly different" from that which the Guidelines called for and the criminal conduct was committed after *Apprendi* was decided.  *Lata*, 2005 WL 1491483.

        Accordingly, sentencing these defendants to a term of imprisonment that is lengthier than the Guidelines recommend does not violate the due process or *ex post facto* clause.

Conclusion

        For the foregoing reasons, I will at sentencing consider a non-Guidelines sentence.

The Clerk is directed to furnish a filed copy of the within to all parties.

SO ORDERED.

Dated :   Brooklyn, New York

July 28, 2005

/s/Charles P. Sifton (electronically signed)
United States District Judge